[Civ. No. 1070.    Third Appellate District.—March 13, 1913.]

GEORGE O. DAVIS et al., Appellants, v. THE HIBERNIA SAVINGS AND LOAN SOCIETY (a Corporation), Respondent.

JUDGMENT—RELIEF ON GROUND OF FRAUD—TIME FOR SEEKING—EQUITABLE CONSIDERATIONS.—In applying the statutory rule that relief in equity from a judgment on the ground of fraud must be sought within three years after discovery by the aggrieved party of the facts constituting the fraud, certain other considerations, equitable in nature, must be regarded.

ID.—FRAUD—EQUITABLE RELIEF—LIMITATION OF ACTIONS.—The right to invoke the aid of equity for fraud after three years have expired, under section 338 of the Code of Civil Procedure, is an exception to the general statute on the subject, and one must bring himself

clearly within the terms of the exception if he desires to claim the benefit of it.

ID.—DISCOVERY OR KNOWLEDGE OF FACTS CONSTITUTING FRAUD—PLEADING.—Discovery and knowledge are not convertible terms. Whether there has been a discovery within the contemplation of the statute is a question of law to be determined by the court from the facts pleaded. It is not therefore sufficient for the plaintiff to aver that he was ignorant of the facts at the time of their occurence and was not informed of them until within the three years. He must show that the acts of fraud were committed under such circumstances that he would not be presumed to have knowledge of them; it being the rule that if he has notice or information of circumstances which would put him on inquiry which if followed would lead to knowledge, or that the facts were presumptively within his knowledge, he will be deemed to have had knowledge of the facts.

ID.—FRAUD—EVIDENCE IN ACTION FOR RELIEF.—The burden of proof rests upon no one more heavily than upon a plaintiff seeking relief on the ground of fraud, and he should not be unduly hampered as to the means of making proof.

ID.—PLEADING—LIMITATION ON RIGHT TO AMEND.—There is some limit to the right to amend pleadings, even when only special demurrers are rightfully sustained.

ID.—ACTION TO VACATE JUDGMENT FOR FRAUD—LIMIT ON RIGHT TO AMEND COMPLAINT.—In this action to set aside a judgment of foreclosure for fraud in preventing a defense upon the merits, the court did not abuse its discretion in sustaining a demurrer to the sixth amended complaint and refusing leave to file a seventh.

APPEAL from an order of the Superior Court of the City and County of San Francisco sustaining a demurrer to a sixth amended complaint and refusing leave to file a seventh. J. M. Seawell, Judge.

The facts are stated in the opinion of the court.

R. P. Henshall, and J. C. Bates, for Appellants.

Tobin & Tobin, and F. S. Brittain, for Respondent.

BURNETT, J.—This appeal is from an order sustaining a demurrer to the sixth amended complaint and directing judgment to be entered for the defendant, and from an order refusing to allow a seventh amended complaint to be filed. For convenience, unless otherwise indicated, we shall refer

to the sixth amended complaint as the *complaint,* and to the seventh as the *amended complaint* and to the first complaint filed as the *original complaint* and to respondent as *the bank.*

Appellants claim that practically the same question is presented for decision in both appeals and their argument is addressed largely to the proposition that the complaint and the proposed amended complaint each stated a cause of action and they declare in their opening brief that ''the motion for leave to file an amended complaint was denied, we suppose it will be conceded, for the reason that the proposed complaint did not state a cause of action; for if it did, it would clearly be an abuse of discretion to refuse permission to file it.''

The two leading cases cited in support of the position that appellants stated a cause of action are *Estudillo* v. *Security Loan etc. Co.,* 149 Cal. 556, [87 Pac. 19], and *Flood* v. *Templeton,* 152 Cal. 148, [13 L. R. A. (N. S.) 579, 92 Pac. 781.] Therein the subject of extrinsic fraud in proceedings analagous to that herein involved was thoroughly considered. In the former it was held that a decree of foreclosure could be successfully assailed upon the ground that there was ''a fraudulent collusion between the attorney for the plaintiffs, who were mortgagors defendant in foreclosure, and who had instructed him to defend against the mortgage debt, and the attorney for the mortgagee, who jointly stipulated for a default judgment for the full amount claimed by fraud, knowing that the mortgagee had received moneys to the use of the mortgagors in the sum of nine thousand six hundred dollars, for which it had failed to account or to credit upon the mortgage debt, and that the property was agreed to be sold by a commissioner who was clerk for the attorney of the mortgagee, and who was caused to disregard the rights of the mortgagors in the sale with intent to deprive plaintiffs of their lands.''

In the Flood case, it was held that, although ''equity will not relieve from the effect of a judgment claimed to have been obtained by fraud when the fraud charged relates to matters upon which the judgment was regularly obtained and where an opportunity was given to the party against whom it was entered to contest the matters in issue or present any defense which was available, as when a judgment is entered

upon a fraudulent claim or procured by false testimony, where the party had an opportunity to be heard as to those matters,'' the rule does not apply where by reason of the fraud of his adversary the innocent party is prevented from prosecuting a meritorious defense to the action.

It is certainly difficult to understand how any other conclusion could have been reached in those cases and it would seem rather surprising to find any one at all familiar with the rudiments of equitable proceedings who would dispute the doctrine therein so clearly expounded.

It is not contended here, though, by respondent, that the facts set forth do not constitute extrinsic fraud as that phrase is contemplated in matters of equitable cognizance and it is not disputed that certain averments would be legally sufficient as the basis for equitable relief were it not for other considerations hereinafter to be noticed.

The position of respondent, so stated by itself, is that, ''1. Assuming the truth of every statement contained in the sixth amended complaint, the plaintiffs were barred by their laches. 2. The fatal laches of the plaintiffs as disclosed by the sixth amended complaint were not, and could not have been overcome in the proposed seventh amended complaint. 3. The principal person in interest has been guilty of repeated acts of false swearing on the record in this action, and therefore, when the sixth and proposed seventh amended complaints were filed the plaintiffs were not in court with clean hands.''

We may concern ourselves principally with the question whether the plaintiffs have displayed that diligence in pressing their claim which is required by the decisions and the statute, keeping in view the admitted disfavor of equity for stale demands.

The statutory rule to be applied is simple and familiar, providing the measure of three years after ''the discovery by the aggrieved party, of the facts constituting the fraud.'' (Code Civ. Proc. sec. 338, subd. 4.)

In applying this rule to a particular case, however, certain other considerations, equitable in their nature, must be regarded. They are forcibly stated in the oft-quoted opinion in *Lady Washington etc. Co.* v. *Wood,* 113 Cal. 482, [45 Pac. 809], and more succinctly declared in *Truett* v. *Onderdonk,* 120 Cal. 581, [53 Pac. 26].

One important observation is that the right of plaintiff to invoke the aid of equity for fraud after three years have expired is an exception to the general statute on the subject and plaintiff must bring himself clearly within the terms of the exception if he desires to claim the benefit of it.

Again, *discovery* and *knowledge* are not convertible terms and whether there has been a *discovery* within the contemplation of the statute is a question of law to be determined by the court from the facts pleaded. It is not, therefore, sufficient for the plaintiff to aver that he was ignorant of the facts at the time of their occurrence and was not informed of them until within the three years. He must show that the acts of fraud were committed under such circumstances that he would not be presumed to have knowledge of them, it being the rule that if he has "notice or information of circumstances which would put him on inquiry which if followed would lead to knowledge, or that the facts were presumptively within his knowledge, he will be deemed to have had actual knowledge of the facts."

In the light of the foregoing we proceed to consider the allegations of the complaint that are deemed material.

On the sixteenth day of August, 1895, one George O. Davis, who was then the owner of the premises in controversy, executed to defendant a mortgage thereon to secure his promissory note to said defendant for the sum of thirty-two thousand dollars. Three days thereafter Davis conveyed said property subject to said mortgage to M. Routh Davis, a *femme sole,* and, on September 26, 1895, they executed another note and mortgage for thirty-two thousand dollars to defendant, in lieu of those executed on said August 16th. Subsequently the said M. Routh Davis conveyed the property subject to the said mortgage to Margaret H. Barkley, and the latter, on April 5, 1898, conveyed it subject to the mortgage to Edward Duncan.

On November 26, 1898, the defendant herein commenced an action against said George O. Davis, M. Routh Davis, Duncan, Barkley and others, in the superior court of the city and county of San Francisco, to foreclose said mortgage to satisfy said debt. Service was made by publication on M. Routh Davis, who resided in Natchez, Mississippi, and on Edward Duncan, who resided in New Orleans, Louisiana. On the

ninth day of April, 1901, a default was entered against said George O. Davis, M. Routh Davis, Margaret H. Barkley, and Edward Duncan, and, on April 15th, following, a decree of foreclosure was signed by said court in which it was ordered that plaintiff therein recover from defendants, George O. Davis, M. Routh Davis, and Margaret H. Barkley, the sum of $42,521.82; on May 21, 1901, the commissioner sold said property to said plaintiff for $42,880, and thereupon issued a certificate of sale and, on the twenty-seventh day of November, 1901, he executed and delivered a commissioner's deed to said plaintiff of said property; that ever since April 20, 1898, the said Margaret H. Barkley has acted as an agent for said Duncan and George O. Davis in relation to all matters pertaining to said property and the indebtedness upon the same and "as such agent has been dealt with and acknowledged by said bank defendant"; that, on or about the latter part of December, 1898, said Barkley ascertained that the said foreclosure suit had been commenced and thereupon interviewed Mr. Alfred Tobin, who was attorney for the bank, and, after a certain colloquy which is set out in the complaint, she offered to pay one thousand two hundred dollars on the indebtedness of said Duncan provided the foreclosure suit should be dismissed, and a few days later Mr. Tobin notified her by letter that the bank had accepted the one thousand two hundred dollars, and the suit would be dismissed, and a few days thereafter she was informed that the suit *had* been dismissed, and, on the second day of February, 1899, the action *was* dismissed as to M. Routh Davis, George O. Davis, and Margaret H. McDonald (now Margaret H. Barkley), and after said time neither said Barkley nor George O. Davis paid any attention to said suit; that, in the latter part of June, 1901, she ascertained for the first time that said judgment of foreclosure had been entered; and said Duncan did not at any time know and had not been informed, up to the time of his death (July 24, 1903) that any judgment had been entered against him; that, upon learning of said judgment, said Barkley went to the bank and informed J. J. Tobin, the secretary, that she would be compelled, on behalf of said Duncan, to commence a suit to have the judgment set aside for the reason that Duncan had not been served in the action, and the amount of the judgment was fifteen thousand dollars in excess of what was due; that

the secretary then stated that he "would call off the fore-
closure and go into an accounting between said Duncan and
the bank as to said indebtedness," as he knew something was
wrong; that, relying upon his promise, neither Davis nor
Barkley took any steps toward having said judgment or sale
set aside; that said matter received no further attention until
about October 14, 1901, when said Barkley interviewed said
Tobin and informed him that no progress had been made in
the matter; after some conversation it was proposed by Tobin
that said Barkley make application for a new loan covering
the amount of the judgment and it would make no difference
with the accounting and the final results, but when the ap-
plication was prepared by the bank accountant it called for
a loan of $57,036.25 and a mortgage to cover the same; she
declined to proceed, and Mr. Tobin acquiesced in her action
and declared again that there would be a just accounting and
only the amount owing to the bank would be demanded; the
negotiations continued, but they were not able to agree upon
the amount due and, in the early part of the year 1903, for
the first time, the bank furnished Mrs. Barkley with state-
ments of the alleged accounting; she immediately took this
statement to James G. Maguire, an attorney at law, but no
further progress was made in ascertaining in what the errors
in the account consisted; and, in February, 1903, a writ of
assistance was issued to let the bank into possession of the
property which had been occupied by said Barkley as the
tenant of Duncan since July 19, 1898, and was so occupied
until the house thereon was destroyed by fire on the nineteenth
day of April, 1906, and said real property is still in possession
of said Barkley; that, upon the issuance of said writ, the bank
threatened to oust the occupants, Barkley and said George O.
Davis, from the premises unless said Barkley accepted an
option to purchase the property for the sum of fifty-seven
thousand dollars and agreed to pay as rent the sum of two
hundred and thirty dollars per month; that, against her will
and for the sole purpose of preventing her personal property
from being thrown into the street, said Barkley accepted said
option on May 15, 1903, and she continued to pay said rent
until the fifteenth day of April, 1904, and she was assured by
J. J. Tobin, in the latter part of 1904, that notwithstanding
the execution of said option he would keep his promise to

reach a full accounting, and as they did not seem to be able to adjust the matter at the bank, she had better consult the state bank commissioners and obtain the name of some competent accountant to examine the books of the bank and ascertain what was the matter, and Tobin further assured her that all amounts paid under said option would be credited to her on any indebtedness shown by the accounting; that, in pursuance of said advice, she consulted said bank commissioners and they recommended one C. D. Stewart as a competent bank accountant; on the following day, assisted by two of said bank's accountants, the said Stewart began the investigation of the books of the bank, having been instructed by Mr. Tobin to make a thorough examination to ascertain the amount due the bank upon said property; that before completing the investigation, Stewart was called out of the state and did not return till 1905, when he resumed the examination, but, upon his demanding, on May 25, 1905, the cash book and books of original entry of said bank, in order to ascertain the amount of money advanced by said bank on account of said loan, said bank, through its attorney, refused to permit him to inspect said books, stating that, without an order of court, said Stewart should have no further access to the bank's books, and, hence, the examination was not completed nor has any accounting ever been completed or rendered and no correct statement of said indebtedness has ever been furnished by said bank; that said judgment of foreclosure was void, since said Duncan was not personally served with the complaint and summons and the attempted service by publication was insufficient to give the court jurisdiction; that said Edward Duncan in his lifetime had a good defense to the action upon the ground of the partial failure of the consideration of said note of thirty-two thousand dollars, the particulars of which are specified in the complaint; "that said plaintiffs did not know, nor did said Margaret Barkley know of the facts constituting said fraud, error and mistake until about three months prior to the commencement of this action, and that not until said time were they or either of them aware of any fact or facts which put them or either of them upon inquiry as to said fraud, error and mistake."

The complaint now being considered was filed June 17, 1910, and the original complaint in the action, May 13, 1908.

The point that jurisdiction of Duncan was not obtained by proper service of the summons and complaint is not argued in appellants' brief, and we may assume that it is not considered available. In passing, it may be stated, however, that we agree with respondent that the service was not so defective as to present a question of jurisdiction.

As is apparent from the foregoing, a series of fraudulent acts is set forth, but the one vital circumtance inspired by a wicked purpose and culminating in the injury to appellants centers and finds its expression in the foreclosure proceedings. That action was brought, as we have stated, on November 26, 1898, and Mrs. Barkley was informed of it not later than the latter part of December, 1898, and, on February 2, 1899, the action was dismissed as to M. Routh Davis, George O. Davis, and Margaret H. McDonald, of which the said George O. Davis was informed. The said Barkley and George O. Davis were authorized to represent Duncan, so that it may be stated that, as early as February, 1899, all the parties in interest had knowledge of the pendency of the action to foreclose the mortgage to secure the payment of the said thirty-two thousand dollars and interest.

We must assume, indeed, that Duncan had actual knowledge of the pendency of the action not later than June, 1900, as there is no averment that he did not receive the copy of the complaint and summons that was mailed to him, although the complaint alleges that Mrs. Barkley stated to Mr. Tobin that Duncan had not received the copies.

No citation of authorities should be needed to the proposition that the defendants in that action were thus put upon inquiry as to the amount of the indebtedness and were called upon to bring forward for litigation any defense that they might have to the bank's claim.

The defendants not answering, a default and judgment would, of course, regularly follow, but, according to the allegations of the complaint, a defense upon the merits was prevented by the fraud of plaintiff and, as stated in *United States* v. *Throckmorton,* 98 U. S. 61, [25 L. Ed. 93], "by reason of something done by the successful party to the suit, there was in fact no adversary trial or decision of the issue in the case. Where the unsuccessful party has been prevented from exhibiting fully his case, by fraud or deception, practiced

on him by his opponent, as by keeping him away from court, a false promise of compromise . . . these and similar cases which show that there has never been a real contest in the trial or hearing of the case, are reasons for which a suit may be sustained to set aside and annul the former judgment or decree, and open the case for a new and fair hearing.''

But notwithstanding the promise of the bank to dismiss the suit, it fraudulently proceeded to judgment, as we have seen, in the sum of over forty thousand dollars, and had it entered April 15, 1901, and the property was sold on May 21st following. This was known to Mrs. Barkley not later than July 1, 1901. Then, of course, she knew that respondent had violated its promise, had perpetrated the fraud, and was no longer worthy of confidence. The substantial injury for which redress is sought was accomplished when said judgment was entered and the property sold. Indeed, the primary purpose of this action here is, as stated in the prayer of the complaint, to have ''said judgment and the sale thereunder and the deed issued in such sale'' set aside, the other relief prayed for being incidental to this.

But Mrs. Barkley was unusually credulous and confiding, and, after making a threat to have the judgment set aside, she was beguiled again by the promise of the secretary ''of the bank that he would furnish an accounting'' and ''would call off the foreclosure.'' But notwithstanding this promise, the deed to the bank was executed and delivered on the twenty-seventh day of November, 1901.

The deceit then having been practiced and carried to fruition, not only under circumstances exciting suspicion and inquiry, but with the actual knowledge of the appellants not later than 1901, it would seem to be doing violence to the statute and decisions to hold that this date must not be selected as the initial point for the operation of the statute of limitations.

Against these plain and simple facts the allegation of the complaint that plaintiffs did not know of the fraud or were not put upon inquiry until three months before the beginning of the action can have no weight or efficacy.

The additional acts of perfidy and the other promises upon which appellants claim to have relied cannot be given the effect to suspend the operation of the statute or to excuse the

duty of appellants. In this connection it is to be observed
that the relation between the parties was that of lender and
borrower, one implying that the parties deal at arm's length
and must look out for themselves. As to this, the case of *Ed-
ward Barron Estate Co.* v. *Woodruff Co.,* 163 Cal. 561, [42
L. R. A. (N. S.) 125, 126 Pac. 351], cited by appellants, is
quite different. There it was urged that ''plaintiff before any
damage was sustained had the means of ascertaining that the
representations complained of were untrue and that it was
guilty of laches in not employing those means and that having
knowledge that one representation was false . . . the plain-
tiff was put upon inquiry whether all representations might
not be false and from that moment was charged with
full notice and that plaintiff did not exercise ordinary care
and prudence and for its failure to do so has barred itself of
any right to relief.'' It is declared by the supreme court that
''The propositions thus set forth are the most serious and
debatable ones in the case.'' It was held, however, and justly
so, that the parties were not dealing at arm's length, that from
the moment the contract was entered into ''the defendants
became, as architects, contractors and superintendents of con-
struction, its trusted agents,'' and that plaintiff had a right to
rely upon the assurance that the work would finally be com-
pleted as promised.

That case did not involve the application of the statute of
limitations and the fraud was actually carried into effect and
consummated and the damage inflicted upon plaintiff after all
the misrepresentations had been made.

It is true the complaint here alleges that ''Mrs. Barkley had
reposed great confidence and trust in said Hibernia Bank and
in all things and matters herein alleged up to the time of said
repudiation, submitted herself to the guidance and direction
of said bank,'' but certainly, unless she was a very extra-
ordinary person, it would not require ''ten years of constantly
broken and as constantly renewed promises'' to destroy
that confidence. The most childlike faith could hardly sur-
vive after the writ of assistance was issued and she was com-
pelled to take an option to buy the property in 1903, but she
waited five years thereafter before bringing this suit.

It is undoubtedly true, as stated by the learned chief justice
in the Estudillo case, that ''The burden of proof rests upon

no one more heavily than upon a plaintiff seeking relief upon the ground of fraud and he ought not to be unduly hampered as to the means of making proof,'' and, it may be added, courts should, as they do, lean toward the trial of such causes upon their merits, but to follow the rule contended for here by appellants would virtually be to nullify the statute and to open the door to more grievous frauds than those intended to be redressed.

The various inconsistencies and manifest misstatements which respondent claims are exhibited by the different complaints disclosing the want of good faith on the part of appellants, we deem unnecessary to consider.

As to the refusal of the court to permit the seventh amended complaint to be filed, there is, of course, some limit to the right to amend, even when only special demurrers are rightfully sustained. It is stated in *Schaake* v. *Eagle etc. Co.*, 135 Cal. 472, [163 Pac. 1025, 67 Pac. 759], that ''we do not say that there is no limit to the right to amend when such demurrers are sustained, since several failures, perhaps but one or two, may develop a want of facts, or show the fault cannot be remedied.''

But here, if we are right in the foregoing views, the proposed seventh amended complaint is more objectionable than the sixth. It sets up additional false statements and carries respondent back to 1896, twelve years before the suit herein was commenced, and it emphasizes the laches and lack of equity exhibited by the said sixth amended complaint.

We think the judgment and order should be affirmed and it is so ordered.

Chipman, P. J., and Hart, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on May 12, 1913.